Afterwards, despite board approval, things of that nature, and the actions of the parties themselves, does that mere moniker make it as a matter of law not a contract that's enforceable? Because that's what the district court held in this particular case. What happened was a real estate developer, VHB, got together with Orix. Orix is a funding arm, that's what they do. They develop projects in relation to funding. On February 16, 2000, they entered into an extensively negotiated letter agreement. Both parties signed it. Portions of that letter agreement were deleted that would have made it contingent. The only issue that remained as of that date was whether or not Orix would obtain board approval. And what's important to note is that Orix, they do this all over the country, has other... Well, the structure of the joint venture was left open. Pardon me, Your Honor? The structure of the joint venture was left open? No. No. Board approval was left open. It was subject to board approval. Yeah. The structure was not left open, Your Honor. So subject to a pre-leasing commitment confirmation of the project budget and board approval. And those were all met. As depicted in the approved budget to be funded on a non-recourse basis. So you don't... The structure of the joint venture was all set by this time? Yes. See, you knew it was going to be done through the two subsidiaries at this point, although it's not in this agreement. No, they're not subsidiaries. They're stand-alone. No, but it's not in this agreement. But you say that was already settled by this time? Right. It was either going to be those entities or what that particular agreement says is they may form a different entity. You see, I read the letter in Tennessee in the VHB shall deliver to Orson 10 days of mutual concurrence of the joint venture terms, which suggests to me that there aren't any terms agreed upon yet. Well, the terms are actually in there. Okay. They're on the second page in terms of what the financing is. And then we have the subsequent agreement of the board. And what happens here is if you look at the 1999 letter of intent that we have that we submitted that was with a declaration, that letter of intent says specifically, look, this is subject to a future agreement signed by both parties. That language was not in this particular letter of agreement. Let me ask you a question about the board approval because that's perhaps the biggest argument that you've got with respect to the letters of intent. You argue just that the board approved it. I mean, that's primarily the thing you keep repeating. And prove it did approve something. But what it approved was the application. And the application itself leaves open completion of due diligence and a formal joint venture agreement. So I'm a little ‑‑ I just wanted your help because the record is a little fuzzy. Well, Your Honor, the key I think is the June 27, 2000 letter that conveys board approval to DHPN that is transitioned and provided to the city. Because I understand that's what the packet says. And there are lots of different potential conditions on board approval. One of the conditions on board approval in the packet is that the property will be sold. Well, that's obviously in the future. If you look at the board approval itself, where every single person, to include Mr. Parenton, the president of the company, went through and signed off on it and initialed it. There are no conditions. None whatsoever. And if you look at that June 27 letter. But they were approving the application. Yes? No. They were issuing board approval for this joint venture. And that is expressed in the June 27, 2000 letter that went out. And that was subject to the DDA. The DDA specifically said there's a particular provision for that that we cited that said, look, DHB has to provide to the city the firm assurances that they're going to get funding. And folks knew that. And in fact, in that June 27 letter, they referenced that. And they said, this is the letter. This is the letter that provides that. So now, absolutely, we have a deal and we're going forward. And the reason why that's important is because that's after the hotspot comes up in June. And throughout this entire time, and this is very critical, at least in our view, there are a tremendous number of negotiations that are going on on behalf of these partners, these partners, DHB and Oryx, in relation to all the tenants, all the other developers, everyone. Oryx is involved. They step in. They start negotiating leases. They renegotiate leases that we've already negotiated and say, no, we have to do this. They represent on their website. We're a partner of DHB. They represent to the city through this June 27 letter. So as of June 22, when you get this letter, you think you have got an agreement, a joint venture agreement? Absolutely. Okay. So what did you think you were signing when you signed the partnership agreement? What we were signing was a document that was going to be used to form the final entity at closing. And this is completely consistent with what happened earlier because what happened is now you go to June 27. We have an agreement. We have a joint venture. In August, if you look at Mr. Hess's testimony, he even says, you know what? On my question, if DHB had gone out and sought other sources of finance, it would have been in breach. Of what? It would have been in breach of this partnership agreement that both parties were going forward through a course of conduct to go ahead and develop this project. That's what was happening. Okay. When this was signed, it was signed August 25, 2000. It was sent to Oryx's counsel to keep and retain for closing. Closing was supposed to happen at the end of August 2000. It didn't happen. It was extended by Oryx. And they never provided us or signed. We don't believe they actually ever signed this. This is all basically a fantasy of this litigation. It's since been signed, but that is the second issue that we go into because what the district court did was they looked through this, and despite the evidence, I think the district court simply said, I'm just going to call this a letter of intent, and as a matter of law, it can't be binding. Okay, I got this other agreement. Let me look at this partnership agreement. Now, under this partnership agreement, there's an out. Now, first of all, we don't believe that that partnership agreement was ever entered into, that partnership agreement, the written agreement, because it was never conveyed to us, and it was never conveyed to DHB in either a right or a wrong. And you really have to have an enforceable joint venture agreement as of June 27th, right? And we didn't. And their alternate theory is that this partnership agreement, the large document that you see that was signed, and they have this out because of that. But that was only supposed to go into effect. Well, that's part of the theory. They're all their theory. I mean, you lose either way. I mean, basically, you have to have an agreement by June 27th. I like to think of it as winning the way. But that argument. Yes, sir. Well, what you need, apparently, is an agreement by June 27th on these under these preliminary arrangements and then no entry of a larger contract. Well, no, even if there's an entry of a larger contract, we believe we can do that because the larger contract has a merger clause. So everything that goes on before is now merged into the new document. Right. Correct. And the document does give them certain rights and that would seem to give them an out in this case. Objectively, you could say that. Now, correct. But you can't call November 3rd after the closing at the end of October at three o'clock in the morning with a phone message saying we're out. And then I mean, can't they do that? I mean, the contract allows them to do that. It doesn't matter what time of day. Oh, you know, seriously, it gives the contract gives them the joint venture agreement. The partnership does give them considerable out. Section 2.5. Yeah. Did they invoke that? No. It was never referenced because there was no. OK, this is just something that was created after the fact. But think about it. This is a multimillion dollar deal. Warriors are going to terminate an agreement. They're going to send a two line letter, two line letter that says we can't go forward. No, what they're going to do is they're going to send a letter to us that says pursuant to Section 2.5, we are hereby terminating the partnership agreement. And by the way, if they do that, they have to convert certain rights to us. That's how they have to terminate. They didn't terminate that way. When they terminate that way, they have to provide us with an opportunity to buy back. They didn't do that. They never did that. So they never invoked Section 2.5. This was just created after the fact. And the whole point of this is, this is a question of fact. This is a question of fact that should have been weighed by the district court. This is a question of fact that should have gone to the jury. Because clearly, joint venture agreements can be finished by both writings, orally, and by actions. And this district court said no. I'm going to call this a letter of intent, therefore it must not have been. Why isn't this governed by the law of Illinois? Pardon me? Why isn't this governed by the law of Illinois? Well, it could be if we had gone under the particular agreement. But we hadn't. Neither party raised that. Well, I know they haven't raised it. But the agreement says it's governed by the laws of Illinois. The partnership agreement. Right. Yes. And if it would have closed and we would have entered into it, it would have. So why isn't the closure governed by the laws of Illinois? You think not? I suppose that's true. Because it wasn't closed. So that's the entire agreement. If it's closed. All right. Let's assume that it's closed. Your further argument is that the obligations there are further obligations. If it's closed, you would agree that probably Illinois law controls? Right. And they would have moved us to Illinois? What happened was we started the lawsuit. These theories developed as we went along to include the theory that the document had been signed.  I don't believe that that's something that as a matter of law we can find. I think that a jury, I think that six members of the jury could look at this and say, you know what? Based on standard conventions, I don't believe you, Mr. Carrington. I don't believe that you signed that. Sent it to your lawyers, a noted large international law firm. And they just sat on it without a transmittal document, without a record. Didn't do anything. Didn't even call to say to BHP, hold off signing that agreement. I think that a jury could say, you know what? I don't think that ever happened. If I understand the theory of the district court, and certainly one of the arguments of your opponents is that they don't have to sign it. They propose it to you, you sign it, and then they accept it. And that's not the law. That is the law, Your Honor, if they do something that is different that shows they have accepted. They didn't do that. The course of conduct that they had before and the course of conduct that they had after is the same. They proposed the contract to you, delivered it to you, and you signed it. Right. Why do you need a course of conduct? I mean, it was to be signed in counterparts also. I mean, it wasn't the same piece of paper that had to be signed. I mean, you could sign it any time, any place, couldn't you? That's correct. But the law is very clear. You have to have notice. You have to be told. There has to be conveyance of your consent. I mean, I guess the problem, just to hear your response again, Judge Canby's question, I mean, they made an offer. Yes. You accepted it. Right. Now, did they have to accept your acceptance of their offer even though there was no change in between in order for there to be a contract? No. Your Honor, if you give me a contract to mow your yard, okay, and I just show up and I start mowing your yard, there's an agreement. What have they done? They haven't done anything different. There still has to be. Well, they have to be different other than just propose something that you accept. They have to communicate it. They have to communicate that they accept. But why do they have to accept? You had to accept. Because it's not a unilateral contract. It's a bilateral contract between two parties. Okay. They have to consent and they have to provide us with certain things that they didn't do, a final budget and things of that nature. They didn't do that. That was never sent to us. And the whole reason why it wasn't sent to us, Your Honor, is because that doesn't happen until closing. And they know that. On the argument you made a minute ago on that they really didn't terminate pursuant to the environmental out clause. Yes. Is that where in your ñ was that in your brief? I believe it is. Yes, Your Honor. And essentially what it is is there is a Section 2.5. And then before that, under Section 2.4, there is a Roman numeral Section 23 that they're relying on. That's the environmental out. But if you look at Section 2.5 of the agreement, what's right above it is the end portion of Section 2.4. And that tells you what you have to do. And it says that if you are going to terminate this agreement, you have to do it pursuant to 2.5. And under 2.5, you have to turn around and do certain things. I'll look at it again. I just don't recall that argument in the briefs. And I wonder whether it was made to the district court. It was made to the district court. It was rejected. Well, no, that's all right. It was. Mr. Raymond, what are your tribal issues of fact? If in fact this went to a jury, you know, how would you instruct the jury? In what aspect, Your Honor? Well, on your theory. What would you instruct them to think? I wouldn't instruct the jury. The court wouldn't instruct the jury. But I would certainly argue to the jury certain things. Well, no, I'm asking you what instruction would you propose to the court to give in order to resolve what you see as the tribal issue of fact? The court would instruct the jury that they are to evaluate the circumstances that were involved in this transaction and whether or not there was a meeting of the minds and a contract. And if that contract was entered into, at what date was it entered into? And then secondarily, I believe that in relation to their second argument as to the larger partnership agreement, they would be instructed as to whether or not they found that that agreement had been entered into as to whether or not consent had been formed and transmitted to VHB. Then the impact of that, the impact of that, the meaning and interpretation of that contract, I will agree would be up to the district court. Whether or not factually there was a breach on certain terms would be a question through special interrogatories to the jury. Well, why isn't the same true with respect to the two letters? I didn't hear you. Why isn't the same true with respect to the two letters? I mean, in other words, I take it you would have, you would toss the letters into the mix and have the jury say whether they amounted to a contract. Absolutely. Okay. Do you want to reserve some time for a moment? I would, Your Honor. All right. Thanks. May it please the Court. My name is Elliot Silverman. I'm a partner with the firm of McDermott Will and Emery, Counsel for Oryx Real Estate Equities. The parties to this case are both sophisticated and experienced real estate developers. As such, they're aware of the kind of risks that are involved in these kind of transactions, and they negotiated and prepared a detailed contract that allocated those risks among them. That contract unambiguously gave Oryx the sole discretion to withdraw from the project if it was not satisfied with its environmental due diligence. Well, what do you do with the June 27th letter? The June 27th letter says that it is subject to other terms. That was the letter to the City of Lawthorne. It says, We have approved this project. No. It's a letter to VHB. And it says, Our joint venture agreement terms are proprietary. Okay. It says, This letter will serve as Oryx's intention to fund the required equity and debt capital necessary to develop the project. The approval to fund was granted by our Board of Directors on May 29th, 2000. I mean, what does one make of that letter? This was a letter that was requested by VHB because they wanted to show the City of Lawthorne that the project was going forward. Yes. That letter specifically referred to the joint venture agreement terms, which are confidential. It's telling everybody there are other terms other than what's in this letter. Well, yes, but it does suggest that there is a joint venture term condition in existence, as of the time it was written. What was referred to, I believe, was the contract. What contract? The written joint venture contract. Well, there didn't exist at the time. There were drafts that were going back and forth at that time. There had already been drafts circulated. Even if there had been a contract at that point, it was merged into the written joint venture contract. There is a merger clause. Well, I understand that. But tell me, okay, let me rephrase it. You know, Mr. Lamb argues that, look, you've got the letters of intent. You know, even if they are just letters of intent and not a contract, you put that in context with the conduct of the parties, especially the board approval and especially the June 27th letter, and you're left at a minimum, at a minimum, with a triable issue of fact as to whether by June 27th all of those things don't add up to a deal. I have two answers to that. I'll take the second answer first. Even if it did add up to a deal, it doesn't matter, because subsequently there was a written contract which contained a merger clause and said all prior understandings are off. This is the governing document. Beyond that, I don't think there even was a deal before that. The letter, the June 27th letter, was a letter that was requested to show the city of Hawthorne that the deal is going forward. But you must have known at that time that the city's requirement was for evidence of a binding commitment to fund. We were not a party to any agreement that required that. That was something that VHB was required to produce. And to accommodate them, we gave them this letter, and the letter said, this is subject to other terms that are confidential and were not city of Hawthorne. We're not telling you what those other terms are. They're confidential. We're telling you we approve this subject to terms. The board approval itself was approval of an application. The application had conditions. One of those conditions was execution of a formal contract. One of those conditions was satisfaction of due diligence, including environmental testing. The same contract that gave Oryx the right to refuse to go ahead if it was not satisfied with environmental due diligence also gave VHB the right to withdraw from the joint venture. They had the same right to terminate the contract under Section 2.5, and, in fact, the contract is very clear. If Oryx had not waived and satisfied all conditions by September 30th, VHB could walk away. At no time did they come and say, look, it's September 30th. Are you in or out? As of September 30th, they knew we were troubled by the environmental issues. We were trying to work them out. Each side brought in environmental consultants. They knew the issue was a live issue. As of September 30th, they had the right to say either commit to this firmly, waive all the conditions, tell us your due diligence is satisfied, or we have the right to walk away and get another source of funding. They never invoked that right, and the district court therefore correctly found that the contract is dispositive of all VHB's claims. And VHB tries to avoid the contract by saying, well, you didn't return it. You look what happened. Oryx prepared a contract, sent it to VHB. In fact, there are numerous drafts that go back and forth. We then prepare this version. We send it to VHB. We say this is the exit. The cover letter says this is the execution copy. Please sign this, return it to us, and we will sign it. They then sign it. They return it to us. The testimony is undisputed that we do sign it. But even if they doubt that, it doesn't matter. We told them this is an execution copy. When you sign this and return it to us, we're going to sign it. They sign it, and they send it back to us. At that point, the mere acceptance is sufficient to make this a binding contract. In their brief, they cite Civil Code Section 1581, which requires that acceptance of an offer must be communicated. They ignore the words of 1581 that say that acceptance can be communicated by act or omission. When we tell them this is the execution copy, sign it and return it, and we will sign it, and they send it back, and we don't say anything, that's acceptance. In fact, the record shows there was a prior draft. We sent them as a prior draft, and they signed it and sent it back, and we said, no, no, no, don't sign that one. This is a draft. We still have open issues on our side. When they try to sign a prior agreement, we said no. They sign this one. They give it back to us. We retain it. That's clearly communication of acceptance. So you had no right to amend it at that point or counter-propose, in your view? If we did, we had to say something instantly. If they sign it, we say this is an execution copy. No, I understand. I'm just saying, what you seem to be arguing is as a matter of law, every time that someone returns a contract sent for approval, they sign it, and you take it back, that you have no right to alter the contract, and that may well be under these circumstances. A, I think that is the law, and certainly once we retain it under those circumstances, and don't say anything, and don't object, and don't say, hold on, we still want to think about this a little more, that's clearly an effective communication of acceptance. The district court referenced the consent for their evidence by offering to and actually undertaking to perform. What did the district court mean by that? It was at that point that we began to negotiate with the prospective lessees. We were doing all of the steps. We started getting involved in negotiations with the city of Hawthorne. We did all the steps that we would do if we were going forward to close, because that is exactly what BART's intended to do until the environmental issue came up, and when the environmental issue came up, we attempted to resolve that. Each side got environmental consultants, and when the regional water quality board said, you know, maybe there should be a super fund here, and we said, hold on, do you think this has anything to do with the groundwater contamination, and the water quality board said, we don't know. We're not going to tell you one way or another on that. It's at that point that BART's realized the chance that this impacts the groundwater may be small, but if that chance comes through, the liability would be ruinous. The liability could be tens, hundreds of millions of dollars if this site were involved with the pollution of the groundwater, and that's why the contract explicitly gave BART the right to back out of the contract and refuse to close if it was not satisfied with the environmental due diligence. What's your response to their argument that you really didn't terminate pursuant to the, you didn't follow the steps required to terminate pursuant to the environmental out clause? There is no doubt that the document that we sent them that says we're not going forward referred to the environmental. There was no other basis. No one is saying that there was an ulterior motive or some undisclosed reason. There's nothing that was even talked about other than the environmental. There are only two provisions here. Section 204 is the conditions that must be satisfied in order for the partnership to acquire the property. Section 205 were the terms on which either side could say we are terminating the partnership, and if it happens, neither side invoked that. We did not terminate the partnership. They had the right to terminate the partnership if we chose not to close. They had the right to terminate the partnership. Neither side invoked Section 2.05. But that's not really what the case is about. We were not sued for breaching 2.05. We were sued for breaching 2.04, which is the conditions under which the partnership will acquire the property. So the partnership wasn't terminated. The partnership still exists. So what? Section 204 says the partnership will not acquire the property until and unless the following conditions are satisfied, and one of them was Oryx's satisfaction with environmental due diligence. The role of this Court is not to rewrite the party's contract. It's not to give VHB a better bargain than the one it negotiated. VHB was an experienced, sophisticated real estate developer. It knew what it was signing. It knew that what it signed gave Oryx the right to back out if there were environmental issues that they were not satisfied with. Oryx, because it was providing 100 percent of the financing, insisted on its sole discretion to decide how much environmental risk it wanted to buy. VHB had the right, if we said we're not going forward, to terminate the agreement and say we're going to bring in someone else. They didn't. The September 30th deadline came and went, and both sides tried to work it out. Everybody was betting. VHB was betting that we would be satisfied. They lost that bet, but that's the contract that they negotiated, and that's the contract they signed, and it's not the role of the Court to give them a better deal than the deal that they negotiated for themselves. The District Court correctly granted summary judgment. Its decision should be affirmed in all respects, and I realize I haven't used up my time, but unless the Court has further questions, I'm going to end my brief. Any further questions? Thank you for your argument, Your Honor. May it please the Court, I see I have a few minutes. First of all, what I'd like to do is, and I apologize, I didn't know this off the top of my head, but the reference in the reply brief to the section we were talking about is at page 20 of the reply brief, which specifically references section 2.4 and 2.5 of the agreement, and I think it's instructive to look at that, because if you look at the preparatory paragraph to section 2.5, it says, in the event that any of the conditions set forth in subparagraphs I, through and including XXDIII, that's 23, that's the environmental act, have not been met to the satisfaction of ORECs or otherwise waived by ORECs, on or before August 30, 2000, then in such event, the partnership shall not acquire the property. So what are we doing? If that hasn't happened, what are we doing? An OREC shall be entitled to terminate the partnership pursuant to section 2.5 thereof. And then if you look at section 2.5, it says, if ORECs elect to terminate the partnership pursuant to sections 2.3 or 2.4, or if the partners determine or abandon the project prior to commencement of construction, ORECs shall be required to offer to transfer the VHB in return for the payment to ORECs at the buyout price as hereinafter defined. And then there's just a litany of things that they've got to do, Your Honor, and what they do is they call us at 3 o'clock in the morning and they send us a two-line letter the next day that says, Dear Kim, to counsel, this letter will confirm our discussions of earlier today. ORECs is unwilling to proceed with the above project as long as the property is linked to the regional groundwater contamination problem. But why isn't there a remedy then just to require them to pay the items described in 2.5a? In other words, if you think they didn't, it seems to me there are two different conditions here. ORECs may terminate the contract, and if they do so, there are certain consequences. You seem to be saying they can't terminate the contract because the consequences didn't occur, which doesn't necessarily make sense to me. No, what I'm saying is that if they terminate the contract, they have to terminate the contract, and they did. First and foremost, this contract was never in effect because it is very clear it was never communicated to us, and what their intention was essentially was that we didn't know this, which is why we originally had a fraud claim, which is not before this court. But they basically were sitting there and waiting and sandbagging. They wanted to have all the balls in their court and be able to make the ultimate decision at the very end. But they didn't tell us that. No, the contract seems to provide for it, though. It doesn't make any difference in this context. But that contract was supposed to go into effect August 31st at the closing, after it was all done. And if they were going to invoke that, they would have told us. It's interesting. What you heard from counsel was in relation to the prior draft, oh, we told them no, you can't do that. You can't do that. Here's the other draft. But they don't tell us anything on the final. They don't give us a site plan. They don't give us a budget. They don't sign it. They don't send it back. They don't even give us a phone call or a letter to say this partnership is in effect. And that is completely inconsistent with what Mr. Hess testified when he testified that in August, before this happened, we had an agreement. Because we did. And we believe it's a question of fact. Thank you very much. Thank you. The case will be submitted. Let's see what the oral argument in the last case on the oral argument calendar for this morning, on the wallet versus selection of mutual debt. Thank you.
judges: Canby, Rymer, Thomas